## DOWNS v. ANDREWS.

Court of Appeals of District of Columbia.
Submitted January 9, 1928. Decided
March 5, 1928.

No. 1996.

1. **Patents ⬳90(5)—Date of application for patent is regarded as date of conception and reduction to practice, in absence of evidence establishing earlier date.**

Where party to interference proceeding claimed in preliminary statement that he conceived and disclosed idea July 28, 1918, but did not file application for patent until November 13, 1919, later date must be regarded as date of conception and reduction to practice, in absence of evidence establishing earlier date.

2. **Patents ⬳91(1)—"Junior party" must show priority of invention in interference proceeding.**

In interference proceeding, party who filed application last is "junior party," and has burden of proving priority of invention.

3. **Patents ⬳91(4)—Evidence held to support award to junior party of priority of invention involving use of aluminum as catalyst carrier in producing certain chemical compounds.**

Evidence held sufficient to support decision of Commissioner of Patents in interference proceeding, awarding junior party priority of invention involving idea that aluminum possessed properties which would successfully meet requirements of catalyst carrier in producing certain chemical compounds.

4. **Patents ⬳30(2)—Conception of idea for patent is act of mind, having no value as evidence until its existence is manifested by acts or declarations.**

In determining priority in patent interference proceeding, conception is act of mind, and has no value as evidence until its existence has been manifested or proved by exterior acts or declarations.

5. **Patents ⬳30(2)—Reduction to practice requires that invention should be so tested that efficacy and utility are demonstrated, but not that practical embodiment of idea should be mechanically perfect.**

While reduction to practice requires that invention be so tested that its efficacy and utility are demonstrated, it is not necessary that practical embodiment of idea of invention should be mechanically perfect, since, if operative means accomplishes desired ends, reduction to practice is established, though elements of device should have been made stronger, or given better shape, arrangement, or adjustment.

6. **Patents ⬳49—That improvements may be made does not show invention was without practical utility, or that reduction to practice was failure.**

Fact that improvements, obvious to one skilled in art, may be made to perfect operation of means and increase its practical efficiency, does not justify conclusion that invention was without practical utility, or that reduction to practice was failure.

Appeal from the Commissioner of Patents.

Interference proceeding between Charles R. Downs and Chester E. Andrews. From a decision of the Commissioner of Patents, awarding priority of invention to Andrews, Downs appeals. Affirmed.

See, also, 56 App. D. C. 398, 8 F.(2d) 1014.

W. B. Morton, M. W. Sage, E. H. Merchant, and G. J. Hesselman, all of New York City, for appellant.

B. G. Foster, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. This is an appeal from a decision of the Commissioner of Patents, awarding in an interference proceeding priority of invention to the junior party, Chester E. Andrews, thereby affirming the decision of the Examiners in Chief, affirming the decision of the Examiner of Interferences.

The subject-matter of the interference is defined in four counts which are as follows:

(1) "A catalytic body comprising a base of aluminum and a metal oxide catalyst on said aluminum and in direct contact therewith."

(2) "In a converter the combination with a catalyst, comprising vanadium oxide, of a support or carrier for the same comprising aluminum and having the vanadium oxide in direct contact therewith."

(3) "A catalytic body comprising a base of aluminum and vanadium oxide on said aluminum and in direct contact therewith."

(4) "A catalytic body comprising a base of aluminum and an oxide of a metal of the fifth or sixth groups of the periodic system on said aluminum and in direct contact therewith."

It seems to be conceded by the parties that the production of certain chemical compounds from hydrocarbons requires that the hydrocarbon used shall be partially, not completely, oxidized in order to secure the chem-

ical action desired. Even if there be partial oxidation of the hydrocarbon, and even if all the chemical elements necessary to constitute the particular compound be present, their chemical combination into the compound cannot be effectuated without the aid of a catalyst. Just what a catalyst does and how it acts nobody seems to know. All that appears to be known is that there are chemical combinations, which cannot be accomplished without a catalyst, and that the catalyst itself suffers no permanent chemical change. Apparently a catalyst bridges the abyss between the chemical elements and permits them to get together. So far as chemical change is concerned, nothing happens without it, and nothing happens to it. By partial oxidation and the use of a catalyzer, maleic acid may be produced from benzene, anthraquinone from anthracene and phthalic acid from napthalene. The catalyst used for the production of phthalic acid from partially oxidized napthalene in the vapor state is vanadium oxide. Vanadium oxide is a powder, and to be effectively used must be supported or carried by a good conductor of heat having mechanical strength, durability, and a melting point not lower than that of the catalyst.

Before the discovery that aluminum had special qualities which peculiarly fitted it for use as a catalyst carrier, various substances, such as pumice, glass, asbestos, sand, glass wool, kieselguhr, coke, nickel, iron, cobalt, and some of the heavier metals were used as catalyst carriers. Some of those carriers were poor conductors of heat, some of them interfered with the chemical reaction contemplated, and all of them were more or less unsatisfactory, inasmuch as they detrimentally affected the production of the chemical compounds desired. The fact that the catalyst carriers known to the art were not all that could be wished for was a challenge to the inventive faculties of Downs and Andrews, and both of them undertook the task of finding a *carrier* which would save the catalyzer from deterioration and give to it longer efficiency. In considering the claims of both men, it should not be forgotten that the objective sought by both was, not the production of new chemical compounds or of a new catalyst to induce chemical reaction, but the development of a support or carrier which would hold the catalyst and prolong its active life.

[1] It appears from Downs' preliminary statement that about the 28th of July, 1918, he conceived and disclosed the idea that aluminum possessed the properties which would successfully meet the requirements of a catalyst carrier. However, as Downs filed his application for a patent on November 13, 1919, that date must be regarded as his date of conception and reduction to practice, in the absence of evidence establishing an earlier date.

[2] Andrews filed his application for a patent on October 22, 1920, subsequent to the filing by Downs. Andrews was, therefore, the junior party, and upon him was imposed the burden of proving his priority of invention.

### Andrews' Case:

[3] Andrews in his own behalf testified that early in November, 1918, he conceived as a catalytic body the combination of the metal aluminum with vanadium oxide in contact therewith, and in that month explained and disclosed his invention to J. M. Selden, Sr., J. E. Randall, and others; that he first experimented with his invention in January, 1919, and that the first written description of his invention was made on January 27, 1919, by K. B. John, in John's notebook; that John was employed by the Walker Chemical Company, of Pittsburgh, but in making the experiment described in said notebook was working under the witness' direction; that in July, 1919, a sketch was made by J. E. Randall of a converter of which metallic aluminum as a carrier of vanadium oxide formed a part; that on August 24, 1919, the converter so sketched was constructed and put into operation; that the witness did not know how Mr. Randall came to make the sketch, but that he had discussed with Mr. Randall the utilizing of vanadium oxide as a catalyst on aluminum as a carrier; that after this sketch was made it was determined to install the construction indicated thereby in one of the converters of the plant; that requisitions for the installation were made out before the end of July, 1919, and one of the converter units was made ready to receive the installation; that the converter equipped with aluminum and vanadium oxide thereon was a full size plant converter for commercial purposes, and that it was used continuously between August 23, 1919, and October 31, 1919, for the vapor phase oxidation of napthalene and the production of phthalic anhydride; that the phthalic acid produced by the converter became a part of the plant production, and was purified and sold; that the operation of the first converter installed and provided with the aluminum carrier for vanadium oxide compared favorably with the ordinary run of converters not equipped with the

aluminum carrier; that the converter, as appears from the witness' notebook was dismantled on October 31, 1919, not because it would not successfully produce phthalic anhydride but for the purpose of inspecting the internal construction; that as the result of such inspection it was found that to a slight extent melting had occurred in unit No. 3; that because of the melting it was decided to build another converter, using thicker metallic aluminum as a carrier for the vanadium oxide catalyst, and thereby avoid trouble from melting; that it was decided to completely line this converter with sheet aluminum, make it gas tight, and use trays and spreading strips of a much thicker cast of aluminum; that the witness made a complete drawing of this aluminum lining on January 27, 1920 (the drawing produced by the witness was introduced in evidence); that the new converter unit was made ready and provided with a thicker aluminum lining and thicker aluminum trays, supported by pieces of inch and a quarter aluminum pipe; that the new converter was operated from February 25, 1920, to September 12, 1920, with the exception of the period from May 3 to June 15, during which the production of phthalic anhydride ceased, because of the difficulty in obtaining a sufficient quantity of napthalene; that during that time (that is, February 25 to September 12) the converter produced phthalic anhydride, which was purified and sold; that the converter was shut down from September 12 to September 15, in order that its condition might be inspected; that the inspection disclosed that some of the aluminum trays were slightly warped, but that the whole structure was intact and in position.

In corroboration of this witness' testimony as to the installation of the converter, the date on which it commenced operations, and the production in pounds of phthalic acid of each of the converter units, Andrews produced written notes made by him.

Kenneth B. John testified, on behalf of Andrews, that he was an engineer, and that he was employed by the Walker Chemical Company, at Pittsburgh, on the 23d of December, 1918; that Andrews in January, 1919, was engaged in trying to make a catalyst that would be self-supporting, by causing it to adhere to various metals; that in that month the witness, *under the direction of Andrews*, tried to coat aluminum wire with molten vanadium oxide, and kept notes of a specific experiment made by him on the 27th of January, 1919; that according to the notes made by the witness:

"A few experiments were run by heating the catalyst and dipping aluminum into it. The rod used was about No. 3 aluminum wire. The catalyst seemed to stick to this very well, but great care had to be exercised in the dipping, due to the fact that aluminum melts at practically the same temperature as the catalyst. One at 657, the other at 658. In one case aluminum melted into the molten catalyst. The mixture was poured into a mold before the aluminum had time to become entirely molten. In this the aluminum and catalyst seemed to stay together very well, without cracking or breaking."

John also testified that the catalyst used was vanadium pentoxide, and that the experiment referred to in his notes was made under the direction of Andrews; that two units were erected by the Walker Chemical Company, both of which units used the catalyst in direct contact with the aluminum; that the first unit was built in August, 1919, and was operated for about two months, and produced phthalic anhydride; that after two months of operation the unit was opened up and examined; that on such examination it was found that in places the aluminum spreaders and trays had sagged slightly, because of the heat, and in some places the aluminum had melted, but that notwithstanding the sagging and the melting disclosed by the inspection, the converter was capable of producing phthalic anhydride; that the second unit was built in the latter part of February or in March, 1920, and was lined with aluminum plates, welded together; that the catalyst carriers were made of square plates of cast aluminum and were separated by rectangular aluminum castings placed in a crisscross manner; that all of the aluminum surfaces were coated with a catalyst; that the tube through which the pyrometers and air were introduced were also of aluminum; that the second unit was operated for some time, and produced phthalic anhydride, and was then opened up and examined, to determine its contents; that its condition was quite good, although some of the plates were warped.

Carl E. Ruth, a chemist, testified, on behalf of Andrews, that he was employed by the Selden Company on January 28, 1919; that a few days after his employment he saw Andrews and John experimenting at the plant with different catalyst carriers; that one of the carriers used was aluminum, and the catalyst was vanadium pentoxide; that two units using aluminum as a carrier for vanadium pentoxide were put in operation and produced phthalic anhydride; that the

first unit was built in the fall of 1919, and the second in the spring of 1920; that both units were built primarily under Mr. Andrews' instruction, but that it was left to the witness to carry out the actual work; that the unit constructed in the fall of 1919 was operated for about *six or eight weeks* and successfully produced phthalic anhydride; that operation of the unit constructed in the fall of 1919 was suspended, in order that it *might be opened up and inspected;* that on such inspection the witness noted that a small quantity of the catalyst had disappeared, but that the condition of the unit at that time did not materially differ from its condition at the time it was put in operation; that the second unit was continued in operation until the late fall of 1920, when its further operation was suspended 'for the purpose of inspecting it; 'that the inspection of the second unit disclosed that it was in good shape although some of the plates had become slightly warped.

Harry Pafford testified, for Andrews, that on November 27, 1919, he was employed by the Walker Chemical Company as an operator of converters for the production of phthalic anhydride acid; that in March, 1920, there was in building E of the company's plant a converter lined with aluminum and equipped with aluminum plates covered with a catalyst; that he operated the converter so equipped the same as other units of the plant; that that converter was operated, as well as he could remember, for *about six months* and that it was torn down and the trays removed in September or October, 1920; that he found some of the trays slightly warped, but otherwise in good condition; that said aluminum equipped unit operated successfully and produced phthalic anhydride for a period of six months; that the phthalic anhydride so produced was stored with phthalic anhydride produced by other units and purified for sale.

Clifford Hutchins testified, for Andrews, that he was employed by the Walker Chemical Company on the 13th of October, 1919; that after the first two weeks of his employment he was an operator of units for the production of phthalic anhydride; that No. 5 unit was built with aluminum trays with catalyst sprinkled on them; that No. 5 unit was operated for a period of *six months;* that it developed no trouble and operated as well as could be expected.

Edward C. Orth testified, on behalf of Andrews, that he was employed by the Walker Chemical Company from September 17, 1919, until about June, 1920; that he was an operator of units for the production of phthalic anhydride; that unit No. 5 was equipped with aluminum slabs, which were put in place in his presence.

John J. Scanlon testified, for Andrews, that he was employed by the Walker Chemical Company from 1918 until 1920 as shift foreman, in charge of men operating the units for making phthalic acid; that unit No. 3 was equipped in August, 1919, with aluminum trays; that it was his duty to pay especial attention to this particular unit, inasmuch as aluminum trays were used for the first time in that unit; that unit No. 3, containing thin aluminum trays, operated successfully for about 2½ months; that unit No. 5 was, he thought, equipped with thick aluminum trays about the last part of November.

### Downs' Case.

Robert R. Sawhill testified, for Downs, that he was employed by the Walker Chemical Company from the first part of the year 1919 until the latter part of September, 1919; that aluminum plates carrying vanadium oxide were installed in converter 3 in the latter part of August, 1919, and that those plates were, *to the best of his knowledge,* in use for approximately *two weeks;* that he saw some of the plates before leaving the service of the Walker Chemical Company, and that they were warped and partially melted.

Harry G. Baer testified, for Downs, that he was employed by the Walker Chemical Company from January 17, 1918, until June 30, 1919; that he did not know of any aluminum trays being installed in any of the converters of the Walker Chemical Company.

Malcolm K. Spieth testified, for Downs, that he was employed by the Walker Chemical Company from June, 1918, to August, 1919; that he knew Kenneth B. John and was employed in the same room with him; that he never saw John experimenting with aluminum rods; *that he never heard of any converter used by the Walker Chemical Company that had aluminum plates or trays in them, and that the only converters of which he was aware had tile trays;* that he might have been absent from his employment on January 27, 1919, because of a cold.

Frank A. Reese testified that he was employed by the Walker Chemical Company from September, 1918, to December, 1920; that he knew Kenneth B. John, and that the witness never saw John working with aluminum rods; *that one of the converters operated by the witness was equipped with aluminum trays, which were put in about August, 1919; that to the best of his knowl-*

*edge* the trays were removed *early in September, about two weeks after they were put in;* that *he believed* that the trays were discarded; that it *seemed possible* to him that the plates were removed because of being unsuccessful; that after the removal of the aluminum trays fire clay trays were put in; that he did not know of any other converter which was operated with aluminum trays, but that it *was possible* that some other converter was so equipped; that he was out of the service of the Walker Chemical Company for a short time, but did not remember how long; that to the best of his knowledge the converter equipped with aluminum trays produced phthalic anhydride; and that that product was placed in barrels which were taken to the stock room.

Leslie J. Wolfe testified, for Downs, that he was employed by the Walker Chemical Company from the latter part of October, 1917, until December 31, 1920; that he was doing mechanical work in the building of converters and helped to operate them at intervals; that the converters were used for the conversion of napthalene into phthalic acid; that in August, 1919, a converter was, for the first time, equipped with aluminum trays; that that converter was known as No. 3 and that it was operated for a short time, approximately 10 days; that the aluminum trays were then taken out and replaced by a tile tray; that thereafter converter No. 3 continued to operate with tile trays; that the aluminum trays taken out of No. 3 were left lying on the floor of the plant, and that some of them were badly warped; that the corner of one of the trays was fused off; that none of the trays taken out of No. 3 were ever used again; that early in the year 1920 converter No. 5 was equipped with aluminum lining and aluminum trays; that No. 5 was operated to produce phthalic acid and continued in operation for a period of not over two weeks; that the trays were then removed and were found badly warped and several of them fused and melted; that after the aluminum trays were removed from converter No. 5, tile trays were substituted therefor; that No. 5, with the tile trays, resumed the production of phthalic acid; that Mr. Habeshian placed the aluminum trays in converter No. 3, and that Mr. Andrews was present when that installation was made.

On cross-examination Wolfe stated that he took care of the furnaces, motors, blowers, converters, and the equipment necessary for the operation of the plant, and did the actual work thereon; that No. 3 was operated for the first time with aluminum trays in the presence of Mr. Andrews and Mr. Ruth; that No. 3 produced phthalic acid, but that the production was lower than that of other units. At this point, under instruction of counsel, the witness refused to say whether or not the production records submitted in evidence by Andrews were the records with which the witness was acquainted. Wolfe also testified on cross-examination that Andrews operated converter No. 5 on several occasions; that the witness looked into the condenser of converter No. 5, and found that its production was somewhat smaller by comparison with that of other converters; that he based his statement that unit No. 5 was operated for two weeks on his recollection.

This review of the evidence is made because of the conclusions of fact and of law earnestly argued by counsel for the appellant, and for a proper understanding of the reasons which induced the court to reach its final conclusion.

## The Opinion.

On the evidence hereinbefore recited, the appellant contends first, that the testimony of Andrews that he conceived his invention and disclosed it to Randall and Selden and others in November, 1918, is wholly uncorroborated, and is therefore worthless to establish Andrews' priority of invention; second, that the record and notes made by Kenneth John on the 27th of January, 1919, of the specific experiment with aluminum wire and vanadium oxide, cannot be regarded as proving that Andrews on that date had conceived of the use of aluminum wire as a catalyst carrier; third, that the experiment conducted by John with aluminum wire and vanadium oxide was John's work, and not Andrews' work, and that, even if it could be accepted as Andrews' work, the experiment was obviously a failure, inasmuch as nothing was done with the rods, and that Andrews' conception was, therefore, not fully and completely disclosed as a tangible working thing; fourth, that converter No. 3 was designed by Randall and built by the Walker Chemical Company, and there was, consequently, no evidence of Andrews' conception of the invention or of its reduction to practice.

The testimony of Andrews that he conceived, in November, 1918, the combination by contact of aluminum and vanadium oxide into a catalytic body, and on that day explained and disclosed his conception to Selden and Randall, stands wholly uncorroborated. From that it follows that Novem-

ber, 1918, cannot be accorded to Andrews as the date on which he conceived and disclosed his invention. That Andrews, however, did have in mind in January, 1919, the coating of aluminum with vanadium oxide, and the use of aluminum so coated as a catalytic body, finds corroboration in the things done and the notes made by John under Andrews' direction and seems to be fairly established. True enough, John, and not Andrews, coated aluminum wire with the catalyst vanadium oxide, by dipping the wire into the molten catalyst, and made a record of what was done. Nevertheless, John and Andrews both testified positively that the experiment and the record thereof was made under the direction of Andrews.

There is no claim by John, and no pretense on his part, that he did the things recorded on his own initiative, or that the experiment was his experiment, and not one directed by Andrews. From the fact that John did what he did under the direction of Andrews, it must be concluded that Andrews told John what to do, and that Andrews had a conception of what was to be done. Of course, the coating of aluminum rods with vanadium oxide was not a reduction to practice of the catalyst carrier which Andrews conceived and disclosed to John, but it was a conception and disclosure that the metal aluminum could be utilized as a carrier for vanadium oxide. The testimony of John and the notes made by him are corroborative of the claim of Andrews that he had, as early as January, 1919, conceived the use of aluminum as a catalyst carrier and disclosed his conception to John. John's sworn statement that under the direction of Andrews he coated aluminum wire with vanadium oxide and his written record of what he did must be weighed, and their value determined, by the ordinary rules applicable to such evidence, and not by the rule which precludes the acceptance of a claimant's uncorroborated statements that at a certain time he conceived an invention.

[4] Conception is an act of the mind, and it has no value as evidence until its existence has been manifested and proved by exterior acts or declarations. As was well said by the Examiners in Chief, the law required corroboration of Andrews, not John. But, whether January, 1919, be accepted or rejected as the date of Andrews' conception and disclosure, the evidence in the case establishes beyond a reasonable doubt that his mental conception of the invention was made manifest and disclosed by investing it with a material and visible form not later than August 24, 1919. The conception of an idea is a mental function, and its existence may be proved by deeds, as well as by words. On the last-named date a converter for the production of phthalic anhydride was installed under the instructions of Andrews and equipped with aluminum trays, which were coated with vanadium oxide. As appears from the testimony of practically all of the witnesses in the case, that converter actually produced phthalic anhydride, and the preponderance of evidence establishes that from the date of the installation of the converter until October 31, 1919, it produced phthalic anhydride which was purified and prepared for sale, as was the phthalic anhydride produced by other converters not equipped with the aluminum catalyst carrier.

It is argued by counsel for the appellant that the sketch for this converter was made by Randall, and without the knowledge of Andrews. That is true, but that hardly justifies the conclusion that Randall was either the inventor or that he procured the invention from someone other than Andrews. Especially is the conclusion unwarranted, in view of the fact that Andrews testified that he disclosed his invention to Randall and Selden. That testimony was not corroborated, and avails Andrews nothing so far as conception and disclosure are concerned, but it does show that the conclusion drawn by counsel for the appellant from Randall's making of the sketch was not warranted, inasmuch as the idea embodied in the sketch *might* have been procured from Andrews, and that the "some one else" *might* well have been Andrews.

It is contended by the appellant that the operation of converter No. 3 was an abandoned experiment, and not a reduction to practice, for the reason that it was dismantled on October 31, 1919, and ceased to function as a producer of phthalic anhydride. We cannot sustain that contention, because it affirmatively appears from the evidence that the converter was dismantled for the purpose of inspection, and not because it was a failure. That inspection did disclose that the converter might be improved by substituting thicker aluminum, in order that the slight melting of the aluminum which the inspection developed might be avoided. That converter No. 3 was not an abandoned experiment is further proven by the fact that converter No. 5 was constructed in March, 1920, and equipped with thicker cast aluminum plates to remedy the mechanical defects developed by the commercial use of converter No. 3. Converter No. 5 operated from March, 1920, until September, 1920,

when its operation was suspended for the purpose of inspecting it. The inspection disclosed that the converter was in good shape, although some of the plates had become slightly warped.

[5, 6] While reduction to practice requires that the invention be so tested that its efficacy and utility are demonstrated, it is not necessary that the practical embodiment of the idea of the invention should be mechanically perfect. If the operative means accomplishes the desired end, reduction to practice is established, although it appears on inspection that the elements of the device should have been made stronger, or given a better shape, arrangement, or adjustment. Gallagher v. Hien, 25 App. D. C. 77, 82. The fact that improvements, obvious to the skilled in the art, may be made to perfect the operation of the means or to increase its practical efficiency does not justify the conclusion that the invention was without practical utility, or that its reduction to practice was a failure. American Hide & Leather Splitting & Dressing Mach. Co. v. American Tool & Mach. Co., 1 Fed. Cas. 647, 652; Funk v. Whitely, 25 App. D. C. 313, 315; Lowrie v. Taylor, 27 App. D. C. 522, 526; Burson v. Vogel, 29 App. D. C. 388, 394. Converter No. 3 contained all the essential elements of a practical operative aluminum catalyst carrier, and the commercial use of the converter for the production of phthalic anhydride was a reduction to practice of Andrews' conception. Coffee v. Guerrant, 3 App. D. C. 497, 499, 500.

The decision of the Commissioner of Patents, awarding priority of invention to Andrews, is affirmed.

Affirmed.