**SHULL PERFORATING CO., Inc., v. CAVINS et al.**

**No. 8291.**

Circuit Court of Appeals, Ninth Circuit.

Jan. 10, 1938.

Frank L. A. Graham, of Los Angeles, Cal., for appellant.

Hamer H. Jamieson, of Los Angeles, Cal., for appellees.

Before WILBUR, STEPHENS, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from an interlocutory decree in a suit brought by appellees charging infringement of patent No. 1,917,211 issued to O. A. Cavins. The master found that claims 18 and 24 of the patent were valid and were infringed. The court sustained the finding, and entered an interlocutory decree for an injunction and an accounting.

Appellant contends that the patent is invalid because anticipated by previous patents, and that if valid the claims are limited to a narrow field by the prior art, by the nature of the invention, and by the specifications, and that thus construed there is no infringement.

The patent relates to a bailer for use in deep wells, particularly oil wells, for the purpose of removing sand and other débris from the bottom of the well. The bailer is of the type called a suction bailer or differential pressure bailer; the name being derived from the fact that the bailer is composed of two cylinders, one superimposed upon the other, separated by partition with a valve therein. On the bottom of the lower cylinder is a flap valve which is open while the bailer is descending so that the lower cylinder or chamber is filled with fluid under the hydrostatic pressure of the contents of the well. The upper cylinder is airtight and retains its content of air at atmospheric pressure until the bottom of the well is reached. The two cylinders are separated by a partition containing a valve which opens automatically shortly after the bottom of the well is reached. Upon the opening of the valve the hydrostatic pressure, which in deep wells may be several thousand pounds per square inch, forces the contents of the lower chamber into the upper chamber, and sucks sand and débris from the bottom of the well into the lower chamber, which is called the sand-chamber, where it is retained by the flap valve while the apparatus is hoisted to the surface. We place in the margin claims 18 and 24 of the patent.[1] These claims are summarized by the appellees as follows:

"(1) A sand chamber having a bottom inlet.

"(2) A closed, substantially air-tight air-chamber.

"(3) A third member that is vertically movable with relation to the other two members; that is mounted between the chambers; and that is called a 'valve.'

"(4) Means for effecting a delayed movement of the valve towards its open position when the bailer lands on an obstruction or at the sand in the well."

It is claimed by the appellant that this patent was anticipated by two early patents; one issued January 21, 1868, to John F. Carll, No. 73,577, and one issued to William H. Birge on August 7, 1877, No. 193,915. A description of these earlier devices will not only help to understand the state of the art, but also to understand the more complicated device described in the Cavins patent. Before doing so, however, it should be stated that the principal emphasis of the Cavins patent is upon the delayed action of the valve separating the sand-chamber and the air-chamber. Some form of delayed action is essential to avoid the opening of the valve by hydrostatic pressure, while the bailer is descending, or by striking obstructions projecting from the side of the well or the shoulder at the junction between larger and smaller casings. It is apparent that these difficulties increase with the depth of the well.

---

[1] "18. In a bailer for deep wells, the combination of a casing having a sand chamber below with a bottom inlet, and having a closed substantially air-tight air-chamber above the sand-chamber for holding air at atmospheric pressure, a valve seat, a valve mounted between the chambers for limited up-and-down movement, said valve constructed and mounted so that it maintains itself pressed against its seat while the bailer is descending in the well, thereby maintaining atmospheric pressure in the air-chamber and preventing the well pressure from unseating the valve, means for effecting a delayed movement of the valve away from its seat when the bailer arrives at the sand in the well to enable the liquid under pressure in the sand chamber below the valve to pass upwardly into the air-chamber, and effect the charging of the sand-chamber with sand from the well.

"24. In a bailer, the combination of a casing having a sand chamber, with a bottom inlet, and a closed substantially air-tight chamber, a valve mounted between the chambers for limited up and down movement independent of the sand chamber, and automatic means for effecting a delayed movement of the valve towards its open position when the bailer lands on an obstruction in the well."

Returning to the device of Carll, we show the patent drawing:

when the contact of the piston rod with the bottom releases the piston which is at once forced toward the top of the upper chamber by hydrostatic pressure, thus increasing the size of the lower chamber and filling the bottom of it with débris from the bottom of the well. The piston, before its operation, is seated on a shoulder and for that reason partakes of some of the characteristics of a valve. The appellant contends that it is a valve. We will turn later to a description of the means by which the piston is released in connection with the appellant's claim that we find in this patent a delayed action in the opening of the valve, which anticipates the claim of patent in suit for a delayed action of the valve. It is clear, however, that the action of the piston in the Carll patent is delayed until the end of the piston rod strikes the bottom of the well, and, as will presently appear, for a short time thereafter.

The Birge device, patent 193,915, is shown in the accompanying drawings:

This Carll sand pump might be considered as a single cylinder, instead of two cylinders as in the Cavins patent, with a piston similar to that used in a steam engine closing the upper end, or air-chamber, from the lower end, or sand-chamber. The piston is held in place until the bottom is reached

It has two chambers separated by a valve so arranged that on striking the bottom the upper section telescopes into the lower until it reaches a stopper collar which prevents further telescoping. The opening in the partition between the two chambers is relatively small and closed by a valve with a mushroom-shaped head. The stem of this valve extends downward into and is securely attached to the lower cylinder while the upper end of the stem passes through the head of the upper cylinder. The hydrostatic pressure on the valve is balanced because the end surface of the valve and of the valve stem as well as the upper end of the valve stem projecting through the upper chamber-head, is subjected to the hydrostatic pressure of the well.

In the Birge device, the valve begins to leave its seat the moment any telescoping action occurs. In view of the fact that the valve is a balanced valve, it is held in place during descent solely by the weight of the lower chamber which is suspended from the valve stem. In this device the loading occurs automatically when the bottom of the sand pump lands on the bottom of the well, except in case of mishap where telescoping occurs by reason of striking some obstruction before the bottom is reached.

With reference to securing delayed action of the valve in the Birge patent to give an opportunity for the lower edge of the bailer to dig into the débris when it reaches the bottom of the well before the valve opens, appellant suggests that such delay could be secured by the simple mechanical device of converting the mushroom shaped valve head into a piston and by forming a cylinder around the piston. Then the opening of the valve would be delayed until the piston or valve left the cylinder and the length of the cylinder would measure the delay.

Appellant claims that such a change involves no inventive genius, merely mechanical skill, and that therefore, the Birge device completely anticipates the Cavins patent, including the delayed action of the valves in appellees' patent. If this claim is not sustained he points to the earlier patent of Carll to show that the piston therein is prevented from leaving its seat, until the end of the piston stem has been completely stopped in its descent by the material in the bottom of the well, and also for the short time thereafter required for the operation of the mechanism which releases the piston and thus permits the hydrostatic pressure to force it upward. A brief description of this releasing device is necessary for an understanding of appellant's claim of anticipation over the appellees' patent. We have thus far spoken of the stem of the piston as though it were a solid rod extending through the flap valve at the bottom of the bailer and beyond. As a matter of fact, the stem of the piston projects into a hollow pipe into which it telescopes when the end of the pipe is stopped by striking the bottom of the well.

Without describing the exact details of the operation, it is sufficient to say that the telescoping of this valve stem into the pipe results in releasing the piston after the downward movement of the bailer has progressed for a short distance. This is the delayed action of the valve upon which the appellant relies as an anticipation of the appellees' device.

It is true that we have in the Carll patent delayed action during the descent of the bailer and a short delay after the end of the piston strikes the bottom. It should be noted, however, that this delay does not continue until the lower end of the bailer (that is, the edge of the sand-chamber) strikes the hard bottom, because unless the stem is in a position to be released before that time it will not operate at all. We may assume that it could be so nicely adjusted that the piston would be released at the exact instant when the bottom of the bailer strikes the bottom of the well. But the device does not permit the edges of the cylinder to dig into the hard bottom. Furthermore, the other elements of the combination are different. There are not two cylinders. However, if we consider the piston as a partition creating two cylinders, there is no valve in this partition.

Before further considering whether or not these two patents are an anticipation of appellees' bailer, it is necessary to give a brief description of appellees' patented device.

The novelty of the invention consists in securing the delayed action of the valve connecting the sand-chamber and the air-chamber. This delay is secured in part by a spiral spring holding the valve in position and in part by having a valve which is not rigidly secured to either of the telescoping units but is so adjusted that its motion, although activated by the telescoping of the

two chambers, is of velocity different from and independent of that of the air-chamber as it telescopes upon the sand-chamber. It is this element of the patent which appellees claim is covered by the claims of the patent as described as a "means for effecting a delayed movement of the valve away from its seat," in claim 18, and by the words "up and down movement independent of sand chamber," in claim 24. In neither of these claims it is pointed out that the delayed movement of the valve is for the purpose of enabling the bailer to penetrate the relatively hard sand at the bottom of the well before opening the valve. However, in the description of the patent after describing the type of bailer portrayed in figure 9 of the patent, it is said: "In the type of bailer shown in figure 9 it should be noted that when the bailer shoe strikes the bottom of the well, the spring 115 will be compressed and the downward movement of sleeve 121 is arrested. When this occurs, the upper end of the coupling 119 will not immediately engage the part 116 to stop the push rod 109 and open the valve 108. In this way, a slight delay occurs in opening the valve. This is advantageous because it insures that the shoe of the bailer will have a good 'bite' in the sand before the valve opens. It also tends to prevent the valve from being opened prematurely in case an obstruction is encountered in the well above the bottom."

In another part of the description, speaking of the bailer described in Figure 1, it is said: "When the bailer strikes an obstruction of sand in the well the bailer shoe cuts into the solid accumulation of sand; the subsequent sudden reduction of pressure in the sand chamber causes the higher well pressure to inject the sand into the bailer."

In another place it is said: "In all the embodiments of this invention, the movement of the valve toward its open position is slightly delayed when the bailer shoe strikes the well bottom. This permits time for the shoe to bite into the well bottom."

In one device shown in the appellees' patent (Figures 1, 2, 3, and 4) it appears from the description thereof that the valve may leave its seat the instant the bailer strikes the bottom of the well, or that the action may be delayed fortuitously until contact between what is called hammerhead 93 and block 14 which are separated during the descent by considerable but undefined distance. The appellant points out that in this form of the device there may be no delayed action after the bailer strikes the bottom of the well.[2] The patent drawings covering the first form are here set forth opposite.

---

[2] The patent descriptions make this clear:

"Referring again to Figure 1, it should be understood that in the operation of the bailer the momentum of the block 14 and the valve stem 12 may be sufficient to effect the opening of the valve, but if it is desired to increase the force to open the valve, this may be accomplished by utilizing the momentum of the upper end section 89 of the bailer (see Figure 1). This end section that carries the bail 90 for the bailing cable is mounted so that it is capable of sliding downwardly in the tubular shell of the casing 1 at this point.

"In order to anchor this section 89, its lower end is provided with a stem 91 that slides freely downwardly through a fixed head 92 welded into the tubular casing. The lower end of this stem carries a hammer head 93. With this arrangement it will be evident that, when the bailer strikes the bottom of the well, the momentum of the upper section 89 of the bailer causes it to continue its downward motion, thereby causing the stem 91 to slide through the guide head 92, and cause the hammer head 93 to strike the upper end of the block 14.

"This will give a blow to the block 14 which then operates as an anvil, having its own momentum increased by the blow. This will insure the opening of the valve 1."

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

*Fig. 4.*

It is unnecessary to explain the action of the boiler more fully than we do. Such description can be ascertained by consulting the patent, a public document.

A fair construction of the appellees' patent as a whole would be that the delayed action referred to in claims 18 and 24 not only covers the delay in operation during the progress of the bailer to the bottom of the well and beyond such obstructions as there may be to that progress which would tend to telescope the two chambers of the bailer, but also includes a short interval of time after the bottom of the bailer reaches the sand at the bottom of the well, so that during this slight delay the bailer can bite into the obstructing sand and thus assure the effective utilization of the enormous hydrostatic pressure found in deep wells to force the sand and débris at the bottom into the sand-chamber of the bailer.

The appellant claims that its alleged infringing bailer has no such delay in the action of the valve between the air-chamber and bailer but that the corresponding valve in its bailer begins to open the instant the bottom of the bailer is arrested by the material in the bottom of the well. Consequently, the appellant claims noninfringement because the distinctive delayed action feature of the patented device is a delay after the bailer strikes the bottom of the well, whereas the action of its bailer upon striking the well bottom is immediate.

The appellant also contends that the claims 18 and 24 of the patent in suit are invalid because of the too great generality of the claims in the clauses thereof relating to delayed action. It is contended that neither the means of securing the delay nor the extent of the delay desired or secured are clearly stated in the claims; that said claims merely cover "means for effecting a delayed movement of the valve away from its seat" (claim 18), and "automatic means for effecting delayed movement of the valve," etc. (claim 24). It is claimed that the words "delayed movement" are too general to comply with the requirements of the statute with reference to the issuance of patents. Appellant cites our decision in Henry v. City of Los Angeles, 9 Cir., 255 F. 769, 778, in support of its contention that these phrases are too indefinite to constitute a valid disclosure or claim.

The patentee is entitled to have the claims of the patent construed with reference to the drawings and specifications. Where the means referred to in claims are clearly shown in the description of the patent, this description is sufficient to cover the means thus disclosed and its mechanical equivalents. Walker on Patents, 6 Ed., vol. 1, p. 195, § 162a. This was this court's holding in Henry v. City of Los Angeles, supra. See, also, Wessel v. United Mattress Mach. Co., 6 Cir., 139 F. 11, 15. Furthermore, the term "delayed movement," while not defined with exactitude in the patent, is clarified by the drawings and also by the purpose sought to be achieved by the delayed movement as declared in the patent description. The means for accomplishing the delayed movement of the valve disclosed in the drawings is, as we have before stated, as follows: The valve is allowed to descend with the valve seat to a point where it is arrested by contacting a shoulder or lug or similar device rigidly attached to the sand-chamber which is held stationary upon striking the bottom of the well. It is a delay in the application of force to separate the valve from its seat. The delayed movement thus effected is that achieved by a period of delay during the telescoping of the two parts of the boiler during which the valve remains entirely closed. After this delay it is instantaneously opened.

In addition to the mechanical changes in appellees' patented device as compared with the previous art cited, it is evident from the demand for the patented device and its wide use, that the changes are novel. Basing our judgment upon the difference between the prior art and the patented device and the prompt and widespread recognition of the value of the new device, and recognizing also the difficult problems arising from the enormous hydrostatic pressures encountered in bailing in deep oil wells, we find no difficulty in upholding the conclusion of the special master, sustained by the lower court, that the patent device involved inventive genius and that claims 18 and 24 are valid. But the claims must be narrowly construed in view of the prior art and in view of the fact that a patentee cannot claim a functional result such as delayed action, nor maintain a general claim for means to produce such a functional result covering all means regardless of those shown in the patented device. (See, Thordarson Elec. Mfg. Co. v. General Transformer Corp., 93 F.2d 36, decided Dec. 7, 1937, 7th Circuit Court of Appeals and cases there cited.)

We turn now to the question of infringement. The valve shown in appellees' patent is of a balanced type, but he does not

claim this feature as an element in his patent. The balanced valve is held in position solely by means of a spiral spring. The force necessary to actuate this spring is relatively very small and depends entirely upon the tension of the spring. In the appellant's device, the valve is not of the balanced type. It is held in position by a spring and by the hydrostatic pressure which of course becomes the dominant factor as the bailer descends into the higher pressures of the well.

In response to interrogatories the appellant presented its catalog with illustrations and descriptions of its bailer and stated in effect that the bailer so illustrated was the only one it was manufacturing and using. This declaration was reiterated at the commencement of the trial before the special master. The appellant now claims on appeal that the bailer illustrated in its catalog had never been manufactured by it and was impossible of operation. This point was raised later during the trial before the special master. Appellant claims that the devices it actually manufactured (introduced in evidence as Exhibits "K," "L," and "M") differed in a material respect with reference to the delayed movement of the valve and did not infringe appellees' patent. The master declined to consider the question of infringement with reference to any other device than that mentioned in the catalog which was presented in response to interrogatories by the appellant as its sole and only device.[3] But having refused

---

[3] "The defendant admits in answers to interrogatories the manufacture, use and rental of two structures one known as the Shull Bailer illustrated on pages 6, 7, 8 and 9 of the catalogue attached to answers to interrogatories and the other known as the Shull Perforation Cleaner illustrated on page 10 of the catalogue. Plaintiffs' proof of the alleged infringing tools was rested on the interrogatories and answers received as Exhibit 11. Defendant produced models and full sized tools. * * *

"Present consideration will be confined to the structure as illustrated in the catalogue. * * *

"It can be seen from the illustration on page 7 that the upward movement of the valve cage and the valve stem is limited to the distance between the mandrel and the split nut. If the tool is suspended the weight of the lower part will cause the jacket and cam sleeve to move down until the split nut comes in contact with the mandrel. The round lugs on the valve stem and the square lugs on the valve cage will travel upward in the slots on' the cam sleeve and on out of the slots. * * *

"The defendant offered evidence and produced a full sized bailer of which Exhibit L is a model tending to prove that in its commercial devices the jacket or 'spacing sleeve' is of such a length that the shoulder of the split nut rests against the mandrel when the lugs on the valve stem are in contact with the cam face on the valve cage so that any movement immediately causes the valve to open. Defendant contends that the catalogue illustrations do not accurately portray its bailer and points out that if the tool were made exactly as illustrated it would be inoperative because the lugs would not return to the slots once they became disengaged. However this could be easily remedied without greatly reducing the lost motion. As long as the square lugs remain engaged the round lugs will return to their slots.

"The issues of infringement herein will be determined upon the structure as illustrated in the catalogue. It is for the plaintiffs to designate and prove the structures which they allege to infringe their patent. In this case the plaintiffs saw fit to rest the issues upon the structure admitted in the defendant's answers to interrogatories. * * *

"Evidence was received herein tending to show that the catalogue attached to the answers to interrogatories did not properly represent the defendant's structures. This was not sufficient to overcome the admissions of the answers. If the defendant has manufactured and used structures other than that charged as an infringement it can be determined upon the accounting. * * *

"The defendant's bailer is alleged to infringe claims 18 and 24. This structure has a sand chamber and an air chamber closed at its lower end by a valve. The valve moves independently of the sand chamber. It is not of the balanced type. The claims in issue are not limited to a valve of this type. The determining factor is whether the defendant's device includes means for effecting a delayed movement of the valve. The structure illustrated in the defendant's catalogue does possess means which function to effect such a delayed action. This is found in the interrelation of the jacket, split nut and mandrel which positions the lugs on the valve stem when the bailer is in extended position substantially above the point where they begin to effect an opening of the valve. When the tool strikes the bottom or an obstruction valve movement is de-

to consider whether any device other than this catalog device infringed the patent, the master apparently proposed, and the court made, an interlocutory decree and injunction covering all other forms of the device manufactured by the appellant, and particularly the bailers and models of the bailer which the appellant had produced in court as representing the devices that they were actually manufacturing and using. The decree enjoined any other infringement in general terms.[4]

The bailer disclosed in the appellant's catalog is shown by a number of photographs of drawings and is sufficiently portrayed by the accompanying reproductions of one of such drawings (Fig. 1) if it be remembered that the mandrel extends through and above the split nut, and that the bailer is suspended while being lowered by means attached to the mandrel, so that the bailer is supported during descent by the split nut resting on the shoulder of the mandrel.[5]

---

layed until these lugs have traveled from the extended position to the point of effective valve movement. This lost motion is accomplished by the spacing of the parts involved, which is the mechanical equivalent of the spacing of the parts in the structures of the patent which function to the same end. As shown on page 7 of the catalogue this lost motion is substantial in amount. The defendant's use of the principle of the screw in applying force through the helical slot is mechanically equivalent to the direct application of force in the structures of the patent. It has the additional advantage of increasing the force at the point of application but this does not avoid the claims in issue." (Boldface ours.)

[4] "That a permanent and perpetual injunction issue * * * enjoining the defendant * * * from manufacturing, * * * using * * * any bailers, * * * like those before the Special Master, David B. Head, Esquire, or any bailers or devices to remove sand * * * from deep wells that include, among other elements, automatic means for opening a valve between a sand chamber and a pressure chamber, after the bailer strikes the well bottom, in which bailers, sand pumps or devices by said means there is effected a delayed movement of the valve away from its seat when the bailer arrives at the sand or other obstruction in the well and by said means there is effected a delayed movement of the valve towards its open position when the bailer lands on an obstruction in the well, or any bailers or devices which are capable of adjustment to effect a delayed valve opening, or any other bailers, devices or parts therefor embodying or containing any of the inventions or improvements described and claimed in said claim numbers 18 and 24 of said United States Letters Patent, Number 1,917,211, referred to in the within cause of action, during the remainder of the life of said Letters Patent, Number 1,917,211, or any reissue or extension thereof, or any bailers capable of being used in infringement of said Letters Patent or of any

claim thereof, and from infringing upon or violating said Letters Patent in any way whatsoever, and particularly claims 18 and 24 thereof. * * *"

[5] (Fig. 2 shows the mandrel shoulder in contact with the split nut, and the lug and pin in their respective slots, and is in accord with the appellant's claim as to its shop practice. However, in Fig. 2, the pin on the valve moves in the vertical slot and the lug on the cam sleeve moves in the helical slot, hence the cam sleeve turns, instead of being forced along the edge of the cam as it turns. This difference is of no consequence in the questions involved here. The point is that pressure by the cam is exerted as soon as the bailer reaches the bottom.)

Appellant contends that by reason of the space shown in the accompanying illustration (Fig. 1), between the split nut and the shoulder on the mandrel, when the jacket moves down until the shoulder reaches the split nut, the pin on the valve head, or ball, and the rectangular lug on the valve cage, will be raised sufficiently to be withdrawn from the helical slot and the vertical slot in which they respectively operate. The testimony supports the claim that when so withdrawn the device is impractical because a slight turn of the parts would prevent the pin, or lug, from re-entering its appropriate slot, hence, the mechanism would jam and the valve would not open.

As the bailer disclosed in the appellant's catalog allowed a definite movement for a number of inches after the bailer reached the bottom before the valve would begin to open, this delay closely approximated the delay in the patented device. If the master had adhered to his original proposition that he was only considering the device shown in the appellant's catalog tendered in response to the interrogatories of the appellees, and if the court had confined the injunction to that form of device the appellant would have little to complain of, in fact, nothing except the question of costs because there could be no hardship involved in enjoining it from doing something that it had never done and had no intention of doing, or from preventing it from manufacturing and using a device which, as it contended, was wholly impractical and unusable. But the decree is undoubtedly broad enough to include the devices actually manufactured and used by the appellant and which it claims did not infringe the patent. The master disposed of this claim of noninfringement by holding that he would confine the accounting to the form of device shown in the catalog, and such other devices as on the accounting were found to infringe.

We see no occasion for disturbing the action of the trial court with reference to the catalog device which shows a delayed impact as well as a slow opening of the valve.

■ If the claims made by the appellant are true, it cannot be harmed either by the injunction or accounting with reference to this hypothetical and imaginary bailer. Costs should be imposed upon the appellant because of its presentation by its answer to the interrogatories of the appellees requiring a drawing of the devices it manufactured of a drawing and plan wholly different from that it actually used, although we have no reason to doubt that this was the result of a mistake. Consequently, we dismiss the subject of these catalog illustrations without further comment.

■ Notwithstanding the attitude of the master during the trial and the statement in his opinion and findings that he was only considering the catalog device, it is apparent that he had an opportunity to consider the bailers actually manufactured and used by the appellant (Exhibits "K", "L", and "M"). In view of this situation the question we have to consider is whether or not we should remand the case, with instructions to the master and the lower court to expressly find whether or not these devices so manufactured and used are an infringement of the appellees' patent, or whether we should determine that question of fact upon the record. The form of the decree adopted by the trial court necessarily implies a finding that the bailers which were produced by the appellant before the master as exhibits and which were expressly referred to in his findings and in the decree enjoining the manufacture and use thereof were an infringement of the appellees' patent. We, therefore, under the peculiar circumstances of the case, feel that this matter may be properly disposed of by us without remanding the case for express findings on that question.

■ In considering the question of infringement, the only delayed action of the valve that need be considered is that which would prevent a sudden jar from an obstruction encountered during the descent of the bailer from loading the sand-chamber and the further delay deemed necessary to allow the bailer to bite in the bottom of the well for the proper loading of the sand-chamber. In the patented device, as we have shown, the valve is opened either by a blow from the upper part which telescopes on the lower, or by the inertia of the valve, its stem and parts firmly attached thereto, which may operate to open the valve against the pressure of the spring. In the appellant's device the valve is slowly opened by the action of a cam against a pin extending from the side of the valve or its stem. This action must overcome the hydrostatic pressure of the well which acts to hold the valve in position and consequently must exercise a very great force in deep wells. To accomplish this the momentum

of the moving parts operates against the cam which performs the function of a screw in opening the valve. In effect, the valve is unscrewed from its seat against the hydrostatic pressure in the well. The delay in such a case results from the slow application of force and not from a delay in its application. The appellant claims that there is no delayed action in its device because if the parts are tightly fitted, as they claim they are in their manufactured device, the screw (cam) begins to operate the moment the progress of the sand-chamber is arrested and the telescoping begins. But, we think it clear that the method of operation of the appellant's device does delay action in the sense contemplated by the appellees' patent, that is to say, the edge of the bailer is given an opportunity to bite into the débris before the valve is sufficiently opened to fill the sand-chamber so that the hydrostatic pressure of the well operates against material in the well to force it into the sand-chamber after the bailer has bitten in. This is clearly stated by the appellant in its brief. We quote therefrom as follows:

"Fundamentally there is no reason for the Shull bailer to have 'delayed movement,' for the reason that the Shull valve is not a balanced valve as in the Cavins structure. The Shull valve is held closed by pressure of the fluid in the well. This pressure is great enough to hold the Shull valve closed against any normal accidental force applied to open the valve and which also makes it possible for the Shull structure to be spudded on the bottom of the hole to conform to plaintiffs' theory of 'biting in' without opening the valve. For these reasons it was not necessary to provide 'delayed movement' on the Shull structure and in fact none was provided.

"In the Shull structure the force required to open the valve is enormous and for this reason it is necessary to provide a very powerful mechanism to pry the valve from its seat. Solving this problem the defendant has turned to the most effective means of applying force, and that is, by the principle of the screw, so that as the valve rotates, the cam will in effect provide a helical wedge of relatively small pitch by which the valve may be pried off of its seat. Under these circumstances the provision of 'delayed movement,' in the Shull bailer, would be a disadvantage."

If the claim of the patent is broad enough to cover all possible means of a delayed movement in the operation of the valve between the sand-chamber and the air-chamber, it would, we think, clearly cover a delay affected by a means which operated to open the valve slowly while the bailer is biting into the sand at the bottom of the well, but, as we have already said, the patent cannot be thus broadly construed. Such a claim would be one of function rather than a machine or a combination in a machine or device.

We are then brought face to face with the question as to whether or not the slow opening of the valve against the enormous hydrostatic pressure of the well by means of a screw effect similar to that used in opening an ordinary faucet, is a mechanical equivalent of a device which knocks the valve off its seat by one blow. The result may be the same, but the method is different. To construe a single blow or jerk as the equivalent of the slow action of a screw or wedge would be pressing the doctrine of equivalents beyond all reason in a field where the method of unseating the valve by the application of forces developed by the telescoping of the two sections is old in the art. The patent does not deal with the multiplication of power and consequent slowing of motion which may be necessary to unseat a valve sealed by hydrostatic pressure but which is not necessary to unseat a balanced valve.

With reference to the additional delay in the operation of the valve in the appellant's device due to the fact that the pin may not be in contact with the surface of the cam and the surface of the helical slot when the bailer reaches the well bottom so as to commence to open the valve immediately, we agree with the conclusion of the special master that if the lost motion resulting therefrom results from wear and tear it would not be an infringement of the patent. If the device is manufactured so as to provide for this additional delay, or if it is adjusted for that purpose so that the impact of the forces closing the valve is delayed until after the shoe of the bailer has dug into the bottom of the well, it would be to that extent an infringement. The appellant disclaims any intention to utilize such additional delay, asserts that it is not necessary to do so, and offers exhibits showing its actual construction in which there is no chance for such delay. We think that under such circumstances, there being no intent to infringe or to utilize the device of the patent, the injunction ought not to in-

clude devices which might be altered or adjusted to secure such additional but unnecessary delay. See, St. Louis Union Trust Co. v. Studebaker Corp., 2 Cir., 211 F. 980, 982. It is sufficient if the injunction prohibits the appellant from selling or using its bailers or permitting them to be used when so altered or adjusted. An injunction in broad terms used by the lower court would prevent the appellant from using its device which does not infringe because it might be possibly adjusted so that it would infringe.

We conclude, then, that claims 18 and 24 of the patent are valid, but are to be narrowed in their interpretation to the means shown in the patent, or their equivalents, for the delayed application of the force used in opening the valve after reaching the bottom of the well, and that such means and equivalents do not cover appellant's device where the application of the force is immediate and continues during the telescoping of the parts, but slowed down by the interposition of a cam having a screw effect. It follows that the devices actually manufactured and used by the appellant as presented to the master do not infringe. The catalog device is a clear infringement and the accounting with reference to the manufacture of such a device should go forward subject to proof before the master that such devices have been actually manufactured and used, and the extent thereof.

With reference to the other devices the injunction should be modified to exclude them from its operation, and the accounting should omit them.

It should be here noted that the bill of complaint in this suit was filed June 13, 1934, for infringement of the original Cavins patent No. 1,917,211. Thereafter, application for reissue of the patent was filed in the United States Patent Office and a reissue patent No. 19,679 was granted August 27, 1935, which was prior to the entry of the decree on October 12, 1935. The proceedings for reissue were brought to the master's attention when the case was called for hearing. The injunction covers claims 18 and 24 of the patent No. 1,917,211 "during the remainder of the life of said letters patent, * * * or any reissue or extension thereof." Appellant now contends that as the original patent in suit had been surrendered at the time the decree was entered, there is no basis for a decree upon that patent and no basis for a decree covering any reissue or extension thereof. The provisions of section 4916 of the Revised Statutes, as amended May 24, 1928, 35 U.S.C.A. § 64, are a complete answer to appellant's contentions. That statute provides that: "Such surrender [of the original patent] shall take effect upon the issue of the reissued patent, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent to the extent that its claims are identical with the original patent shall constitute a continuation thereof and have effect continuously from the date of the original patent."

The decree is reversed and the case remanded, with instructions to modify the injunction in accordance with this opinion, and to direct an accounting if the appellees so desire. Costs in the lower court up to the time of this appeal will be borne by the appellant, and the costs of the appeal will be borne by the appellees, future costs to abide the result.